2020 IL App (2d) 180151
No. 2-18-0151
Opinion filed September 29, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Nos. 16-CF-283 16-CM-1034 |
| TWIQWON R. FANE, | ) ) ) | Honorable Val Gunnarsson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justices Zenoff and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial in the circuit court of Stephenson County, defendant, Twiqwon R.
Fane, was convicted of home invasion, burglary, attempted robbery, and aggravated battery. He
was sentenced to 30 years' imprisonment for home invasion and several lesser terms for the other
offenses, which were to run concurrently. He now appeals, raising two alleged errors. First, he
asserts that the trial court should not have given the jury an accomplice-witness instruction (Illinois
Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014) (hereinafter IPI Criminal
No. 3.17)) regarding a witness, Drean McGee, who gave exculpatory testimony for the defense.
Second, he contends, and the State agrees, that the trial court did not properly question the jury in

accordance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). This error was not properly preserved, and the parties disagree as to whether it rises to the level of plain error. However, because we find defendant's first contention of error well taken and his second argument concerns an error that is not likely to recur on retrial, we will not address it here. In light of the following, we reverse and remand.

¶ 2                                    I. BACKGROUND

¶ 3     Defendant was convicted of a number of offenses stemming from a home invasion that occurred on November 18, 2016. The victim, Voncile Modlinger, testified that her home had also been broken into six days earlier. McGee pleaded guilty to home invasion and residential burglary in connection with the incident at issue, and he was sentenced to 10 years' imprisonment. The following testimony was presented at defendant's trial.

¶ 4     The State first called Timothy Weichel, a sergeant with the Freeport Police Department. He testified that he was dispatched to a residence on East Pershing Street in Freeport at about 2:23 a.m. on November 18, 2016, regarding an "open 911 call." An "open 911 call" is a call where someone dialed 911 but no one then spoke, though one could still hear "some type of interaction going on on the phone." Dispatch related that a home invasion was in progress. Weichel parked near the residence and approached on foot. He could hear a female screaming inside. He approached the door and looked through a window. Weichel observed a black man with a long goatee. Weichel pointed his firearm at the man, and the man fled, leaving the residence. Weichel later identified the man as McGee. Weichel believed that there was another subject in the house, as the female was still screaming as if she was being attacked. Weichel entered the residence and found the female, Modlinger, who informed him that both subjects had fled.

¶ 5 Weichel testified that he then started to search for the two subjects. He "could hear leaves crumbling as if somebody was walking through them." He could also hear "dogs aggressively barking" in the area, so he searched in that direction. He believed that the subjects were traveling northeast, and he radioed that to incoming units. About five minutes later, Corporal Ben Johnson radioed that he saw two individuals running through a field near the Provena St. Joseph Center. Weichel proceeded to Provena, where he observed that Johnson had two subjects "proned out" on the ground. He recognized McGee as the man he had observed inside the residence on East Pershing Street. A show-up identification was completed with Modlinger, and the subjects were transported to the police station. Subsequently, Weichel located a white T-shirt near where defendant was taken into custody. The shirt was collected as evidence by Officer James Hodges. McGee did not wear a mask during the home invasion. Weichel identified defendant as the other individual taken into custody at Provena.

¶ 6 On cross-examination, Weichel acknowledged that he moved the white T-shirt before it was photographed. He explained that he did this so he "could continue to look through the debris and other stuff." The shirt was photographed when Hodges collected it.

¶ 7 The State next called Corporal Johnson. At about 2:30 a.m. on November 18, 2016, he received a dispatch about the incident taking place on East Pershing Street. He traveled to a location that he selected based upon what he had heard from Weichel regarding the direction in which the subjects were fleeing. He exited his squad car and heard dogs barking. He then observed two individuals sprinting across a field west of Provena. He radioed this in. They did not see him, and he ran to catch up to them. Johnson entered the parking lot at Provena and saw the two subjects crouching down by a parked truck. Johnson added that it looked as if they were trying to conceal themselves. As he approached, the two subjects saw him and ran. He pursued. The subjects ran

into an area that led to an entrance into Provena, but was otherwise a dead end. One subject was standing in the open, and the other was attempting to hide. Johnson drew his Taser. He ordered both subjects to the ground, and they complied. Another officer arrived, and the subjects were handcuffed. Johnson identified body camera footage that showed a white object in defendant's possession. On cross-examination, Johnson agreed that defendant was cooperative.

¶ 8 Officer Hodges was the State's next witness. At approximately 2:22 a.m. on November 18, 2016, Hodges responded to the area of East Pershing Street in Freeport. Weichel had advised that there were subjects running from the area, heading northeast. Hodges observed two individuals running in the area of Provena. After Johnson secured the individuals, Hodges transported defendant to the police department. Defendant told Hodges that he needed Hodges to "call his people," whom he identified as Lizzy and Gabby. He stated that Gabby was his girlfriend. Defendant stated that Gabby's car had been stolen that night. Subsequently, Hodges returned to Provena, where he photographed a white T-shirt and took it into evidence.

¶ 9 On cross-examination, Hodges acknowledged that he did not turn on his squad car's recording device while he was transporting defendant to the police station. He could not remember whether he had activated his body camera.

¶ 10 The next witness for the State was Alan Guilfoyle, a 911 dispatcher for the Freeport Police Department. At about 2:20 a.m. on November 18, 2016, Guilfoyle received a call regarding a home invasion of a residence on East Pershing Street. He identified a recording of that call. The caller seemed frightened and excited.

¶ 11 The victim, Voncile Modlinger, next testified. She stated that she had been living at the residence on East Pershing Street for over 50 years. In November 2016, the residence was broken

into twice. The first break-in occurred on November 12, 2016. During the first break-in, the intruder took money and her phone. She bought a new phone and kept it in bed beside her.

¶ 12    On November 18, 2016, in the middle of the night, she heard a noise and called 911. She stated that someone had broken into her house and that she gave the location. This is all she had time to say before one of the intruders arrived at the foot of her bed. His face was covered with something white. He threw a plastic laundry basket at her face. A second man walked in behind the first intruder. She recognized the second individual. The second man said, "This is my cousin," and then "Now don't you hurt her." They ordered Modlinger out of bed. One of the men looked under the mattress. He then grabbed her and pushed her around the bed and into the hall. She saw the other man in her living room, recognizing him, as he had been there before. The first man lifted Modlinger up and down. He threw her, and she was not sure what happened next. Eventually, the police arrived.

¶ 13    On cross-examination, Modlinger agreed that she never heard the two intruders refer to each other as "cuz" or "bro." They did not speak to each other much during the incident.

¶ 14    The State's next witness was Gabrielle Gill. On November 18, 2016, defendant had been her boyfriend, but they were no longer together. On the night of November 17, 2016, she spent the night at defendant's house. When she lay down for the evening, her car was there. Someone had asked if they could use it, and she said yes. When she awoke, her car was gone. She clarified that she had given permission to someone to use the car. When she went to bed between 9:30 and 10 p.m., she was not sure whether defendant was present in the house. She added that she gave defendant's cousin permission to use the car, but not defendant. Further, she agreed that she spoke with Freeport police officer Daniel Moore at about 4 a.m. on November 18, 2016, and told him that defendant had permission to use her car. She explained that this was on the condition that he

had someone to drive him. Gill testified that she knew McGee. McGee was defendant's cousin. She identified a set of car keys (State's exhibit 6) as having been hers on November 18, 2016.

¶ 15    On cross-examination, Gill stated that there was a lot of stuff in the car on November 18, 2016. She explained that both she and defendant were moving. This included a bag of clothes.

¶ 16    The State then called Moore. He testified that he was on duty on November 18, 2016, at approximately 2:30 a.m. He was dispatched to a residence on East Pershing Street, where he spoke to Modlinger. He observed a set of car keys on the living room floor. Modlinger stated that they were not hers, and Moore took possession of them. He located a vehicle parked nearby that the keys operated. He subsequently gave them to Hodges to hold as evidence. Moore identified State's exhibit 6 as the keys he recovered.

¶ 17    Detective Tim Krieger testified that he obtained DNA samples from defendant and McGee. He also obtained a sample from the white T-shirt. Heather May, a forensic scientist, analyzed the samples and determined that neither McGee nor defendant could be excluded from the mixture of DNA samples recovered from the shirt. She further testified that "approximately one in 4.1 million black" individuals could not be excluded from the sample. The State also called several witnesses to testify to the chain of custody of various items of evidence.

¶ 18    The State then rested. Defendant first recalled Guilfoyle. He testified that he did not recall either of the subjects saying that the other was his cousin. during the 911 call. He did, however, hear the subjects call each other "bro" or "cuz" on multiple occasions.

¶ 19    Defendant also called McGee. McGee testified that he was in the custody of the Illinois Department of Corrections as a result of the break-in on East Pershing Street on November 18, 2016. McGee pleaded guilty to home invasion and residential burglary.

¶ 20    McGee testified that on November 17, 2016, he was at his cousin's house on Elk Street. About eight people were present, including defendant, Gill, Liz, Brittany, and James Beales (McGee identified some of those present only by first name). At one point, McGee, defendant, Brittany, and Beales left in Gill's car to go to Logan's (apparently, a tavern). Brittany drove, as she was the only one with a driver's license. They left Logan's together. Brittany subsequently left, and Beales started driving. Defendant got into the front passenger seat. About 30 minutes later, they dropped defendant off near the corner of Rotzler Avenue and Galena Avenue. When defendant left, McGee got in the front passenger seat. Beales and McGee drove around for about 20 minutes and smoked two "blunts." They were "scheming" the home invasion.

¶ 21    They eventually went to Modlinger's house. When asked why they selected Modlinger's house, McGee said he was "just following" Beales. Both men had taken white T-shirts from Gill's car. Beales covered his face. They made contact with Modlinger, and Beales dragged her out of bed. McGee was looking for money. After 10 to 15 minutes, he heard something at the front door and pulled the curtains back. A police officer shined a light into the house at McGee. McGee ran out the other door, saying, "Come on, Cuz" twice to Beales on the way out. McGee testified that he ran across the street and Beales ran up the street. McGee had not put a T-shirt over his face, because the house was dark and he described himself as "black, black". However, he kept the shirt with him.

¶ 22    McGee heard dogs barking. He ran to Provena. As he approached Provena, he noted two police cars in the area, so he crouched down. He saw an individual wearing a black hoody. The individual turned around, and it was defendant. McGee heard someone say "stop" and "get on the ground." He ran and told defendant, "Come on." They ran into a dead end and were cornered. McGee threw his T-shirt to defendant.

¶ 23 McGee testified that he was not a blood relative of defendant but he was of defendant's half-sister. He was a blood relative of Beales.

¶ 24 On cross-examination, McGee acknowledged that he referred to defendant as his cousin. McGee stated that it was his accomplice's idea to target Modlinger's house. McGee denied ever having been there before. After the police officer came to the front door of Modlinger's house, McGee fled, running across a street, through a backyard, through "a woods," past a youth home (Sleezer Home), and to Provena. McGee stated he was alone until he got to Provena. He ran into defendant at Provena. McGee clarified that, though he said that he had run through "woods," it was more of a field. When McGee encountered defendant by Provena, he told defendant that he was "creeping" around because there were two police cars nearby. According to McGee, defendant then stated that he was selling "weed" and that he felt that he was being set up. McGee clarified that defendant was about to meet someone for a drug deal. McGee was about to tell defendant what he and Beales had done when the police arrived. McGee explained that he threw the white T-shirt to defendant just before the police apprehended them, because defendant was closer to the building and he thought that defendant could throw it on the roof.

¶ 25 McGee testified that he and defendant had been friends for 15 to 17 years, though they had had "[a] couple fights." When asked whether he considered defendant a close friend, McGee stated that defendant was "[a] 50/50 friend." When McGee observed defendant at his cousin's house on Elk Street, he did not recall seeing burs on defendant's clothing. On redirect examination, McGee explained that he referred to many people as "cuz" or "bro."

¶ 26 Defendant rested and the State called Hodges in rebuttal. Hodges testified that he collected a black hooded sweatshirt from defendant on the night of November 18, 2016. The sweatshirt was admitted into evidence. The shirt had "cockleburs or prickly things" on the front of it.

¶ 27    The jury was instructed with a modified version of the accomplice-witness instruction, IPI Criminal No. 3.17. The approved version reads:

"When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." IPI Criminal No. 3.17.

The trial court gave the following modified instruction:

"When a witness says he participated in the commission of a crime with which the defendant is charged, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

Defendant interposed a timely objection.

¶ 28    The jury found defendant guilty of home invasion (count II), residential burglary (count III), conspiracy to commit residential burglary (count IV), attempted robbery (count V), aggravated battery (victim over 60 years of age) (count VI), and aggravated battery (while masked) (count VII). This appeal followed.

¶ 29                                    II. ANALYISIS

¶ 30    On appeal, defendant raises two issues. First, he argues that the trial court erred in instructing the jury with a modified version of the accomplice-witness instruction (see IPI Criminal No. 3.17). Second, he asserts that the trial court failed to conduct *voir dire* in accordance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We agree with defendant's first contention.

¶ 31    Defendant argues that the trial court erred by giving the jury a modified version of the accomplice-witness instruction pertaining to McGee's testimony. Defendant concedes that the

instruction is not limited to witnesses called by the State; however, he contends that the instruction may not be given where the witness's testimony is wholly exculpatory. This issue is properly preserved.

¶ 32    Generally, whether to give a jury instruction is a matter committed to the discretion of the trial court; therefore, we review such decisions for an abuse of discretion. *In re Timothy H.*, 301 Ill. App. 3d 1008, 1015 (1998). An abuse of discretion occurs if the instructions given "are not clear enough to avoid misleading the jury or if the jury instructions do not accurately state the law." *Id.* The failure to follow the law is an abuse of discretion. *Cable America, Inc. v. Pace Electronics, Inc.*, 396 Ill. App. 3d 15, 24 (2009). Conversely, whether sufficient evidence exists in the record to warrant giving a particular instruction is a question of law, subject to *de novo* review. *People v. Washington*, 2012 IL 110283, ¶ 19.

¶ 33    At issue here, the accomplice-witness instruction (IPI Criminal No. 3.17) exists "to warn the jury that the witness might have a strong motivation to provide false testimony for the State in exchange for immunity or some other lenient treatment." *People v. Hunt*, 2016 IL App (2d) 140786, ¶ 52. In *People v. Jordan*, 247 Ill. App. 3d 75, 84-85 (1993) (quoting *People v. Riggs¸* 48 Ill. App. 3d 702, 705 (1977)), the court observed, " 'Due to the relationship of the [accomplice] witness and the State, there may be a strong motivation to testify falsely for the accomplice who seeks, hopes or expects lenient treatment by the State in return for favorable testimony.' "

¶ 34    Nevertheless, as defendant acknowledges, it has been held that the accomplice-witness instruction may be given even if the witness was called by the defendant. See *People v. Rivera*, 166 Ill. 2d 279, 292 (1995). However, defendant argues that there is a *per se* rule against giving the instruction when the testimony a witness gives is exculpatory. In support of this assertion, he relies on two cases from this district—*People v. Dodd*, 173 Ill. App. 3d 460 (1988), and *People v.*

*Krush*, 120 Ill. App. 3d 614 (1983). In *Dodd*, defendant points out, this court stated that the instruction "should not be given where the witness' testimony completely fails to implicate the defendant, because the instruction may tend to unduly derogate the defendant's ability to use favorable testimony by an accomplice." *Dodd*, 173 Ill. App. 3d at 467 (citing *Krush*, 120 Ill. App. 3d at 618). The *Dodd* court further stated, "[A] trial court should have discretion to decide whether to advise the jury to accept the accomplice's testimony with caution *unless the testimony completely fails to implicate the defendant*." (Emphasis added.) *Id.* at 466. The court in *Krush*, 120 Ill. App. 3d at 618, similarly observed, "We would agree with the conclusions of these cases insofar as they hold, under their respective facts, that *total* exoneration of a defendant by an accomplice witness called by defendant would preclude giving of the instruction." (Emphasis in original.) See, *e.g.*, *People v. Hanson*, 83 Ill. App. 3d 1108, 1113 (1980).

¶ 35    The State contends, however, that a subsequent supreme court case undercuts defendant's position. In *Rivera*, 166 Ill. 2d at 285, an alleged accomplice testified that he acted alone in murdering the victim and that the defendant had left the premises before the murder occurred. Thus, the witness's testimony *at the defendant's trial* was exculpatory (during the witness's trial, he provided an account that did not exculpate the defendant). Another alleged accomplice testified adversely to the defendant. The defendant requested that the accomplice-witness instruction be given regarding the witness that testified adversely to him, but not regarding the other witness. *Id.* at 291-92. The trial court declined the defendant's request, explaining that "it would not factually limit an instruction and that both sides could make whatever benefit of the instruction they wanted." *Id.* at 292. The supreme court affirmed, stating, "[W]e see no reason why the testimony of Meger, the State's witness, should have been scrutinized more carefully than the testimony of Norman, [the] defendant's witness." *Id.*

-11-

¶ 36    However, as defendant points out, there was a unique circumstance present in *Rivera,* and absent here, that explains why the supreme court sanctioned the use of the accomplice-witness instruction in that case. The accomplice-witness who gave exculpatory testimony during the defendant's trial had previously given testimony implicating the defendant in the witness's own trial. *Id.* at 289. This earlier testimony was admitted as substantive evidence at the defendant's trial. *Id.* Thus, there was inculpatory testimony from the accomplice witness before the jury in *Rivera*; such is not the case here.

¶ 37    Indeed, we note that the accomplice-witness instruction was given in *Rivera* in its unmodified form. *Id.* at 291. The jury was instructed:

> "*When a witness says he was involved in the commission of a crime with the defendant*, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." (Emphasis added.) IPI Criminal No. 3.17.

Since the testimony given by the accomplice witness at the defendant's trial in *Rivera* was exculpatory, the only time the "witness [said] he was involved in the commission of a crime with the defendant" was in the testimony given during the earlier trial. Hence, the *Rivera* court must have deemed that earlier testimony sufficient to trigger giving the instruction; otherwise, it would have been necessary to modify the instruction in a manner similar to what the trial court did here. See *People v. Jackson*, 79 Ill. App. 3d 660, 666 (1979).

¶ 38    Thus, *Rivera* is not inconsistent with *Dodd* and *Krush*. These cases all stand for the proposition that the accomplice-witness instruction may be given where an alleged accomplice witness implicates a defendant. This reading of *Rivera* is confirmed by *People v. Szydloski*, 283 Ill. App. 3d 274 (1996). That case, too, involved exculpatory testimony given by a person the State

alleged to be an accomplice of the defendant. The *Szydloski* court held that, because the witness did not testify that she was involved in a crime with the defendant, it was improper to give the instruction. *Id.* at 277-78. In so ruling, the *Szydloski* court addressed *Rivera*:

> "In *Rivera*, a defense witness attempted to exonerate the defendant; however, unlike the case at bar, that witness's testimony in earlier proceedings had implicated the defendant. This testimony was properly admitted as substantive evidence of Rivera's guilt. [Citation.]. Thus, in contrast to the situation presented here, *Rivera* involved a situation where a defense witness said that he was involved in a crime with the defendant." *Id.* at 277-78.

The *Szydloski* court distinguished *Rivera* because the accomplice witness in *Rivera* had previously implicated the defendant. The instant case is distinguishable on precisely the same basis. Therefore, the rule set forth in *Dodd* and *Krush*—that the instruction should not be given where an accomplice witness wholly exculpates a defendant—controls here.

¶ 39    It is of no moment that the trial court in this case instructed the jury with a modified version of the accomplice-witness instruction. To be sure, the modification reflected the situation before the trial court, because McGee had not testified that he was involved in a crime with defendant, as the instruction states in its unmodified form. See IPI Criminal No. 3.17. Rather, McGee testified that he was involved in a crime with which defendant was charged. However, neither version of the instruction should have been given, as McGee's testimony was wholly exculpatory. Under such circumstances, as the case law cited above makes clear, the accomplice-witness instruction should not be given.

¶ 40    Finally, we cannot deem this error harmless. Generally, an error in instructing the jury is harmless only if "it is demonstrated that the result of the trial would not have been different if the proper instruction had been given." *People v. Johnson*, 146 Ill. 2d 109, 137 (1991). The burden is

on the State to establish that such an error is harmless beyond a reasonable doubt. See *People v. French*, 2020 IL App (3d) 170220, ¶ 28. Here, McGee's testimony represented defendant's entire defense, and resolution of this case turned on the relative credibility of McGee and the State's witnesses. Under such circumstances, we cannot find that this error was harmless. See *People v. Fultz*, 2012 IL App (2d) 101101, ¶ 74.

¶ 41 In short, the trial court erred by giving the accomplice-witness instruction where the testimony of the witness in question failed to implicate defendant. Quite simply, the instruction given in this case did not comport with the law, as explained above. Again, the failure to follow the law is an abuse of discretion. *Cable America, Inc.*, 396 Ill. App. 3d at 24.

¶ 42                                    III. CONCLUSION

¶ 43 In light of the foregoing, the judgment of the circuit court of Stephenson County is reversed and this cause remanded for further proceedings. As we conclude that the evidence in defendant's trial was sufficient to prove his guilt beyond a reasonable doubt (defendant does not challenge the sufficiency of the evidence), double jeopardy does not preclude a retrial. *People v. Olivera*, 164 Ill. 2d 382, 393 (1995).

¶ 44 Reversed and remanded.

---

### No. 2-18-0151

---

| | |
|---|---|
| **Cite as:** | *People v. Fane*, 2020 IL App (2d) 180151 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Stephenson County, Nos. 16-CF-283, 16-CM-1034; the Hon. Val Gunnarsson, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Darren E. Miller, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Carl H. Larson, State's Attorney, of Freeport (Patrick Delfino, Edward R. Psenicka, and Steven A. Rodgers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---